UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHELLY ROMAN
and CHRISTIE MOORE,

    Plaintiffs,

v.

COUNTY OF MONROE,

    Defendant.

Case No. 18-13548

Honorable Laurie J. Michelson
Magistrate Judge R. Steven Whalen

**OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [10]**

Two female corrections officers, Shelly Roman and Christie Moore, allege that their workplace assignments constitute unlawful sex discrimination. Plaintiffs assert that a new policy, which requires three female guards on each team for each shift at the main county jail, deprived them of more favorable work assignments at a less stressful prison facility. Their employer, the County of Monroe, moved for summary judgment. Because a reasonable jury could determine that the County's policy violates Title VII, the County's motion is denied.

**I.**

The main jail in Monroe County houses both men and women. (ECF No. 10, PageID.62.) On an average day, there are about three times as many men (144) as women (47) imprisoned in the main jail. (ECF No. 15-2, PageID.207.) The County also maintains a separate dormitory, which is all-male. (ECF No. 10, PageID.63.)

Corrections officers are assigned to one of two 12-hour shifts. (*Id.*) During the day shift, there are two teams of six people each at the main jail and two teams of five people each at the

dormitory. (ECF No. 15-8, PageID.225.) The same arrangement is true of the night shift except that one of the two dormitory teams is reduced to four officers. (*Id.*)

A longstanding practice requires certain duties related to female inmates in the main jail to be conducted by women. (ECF No. 10, PageID.65.) For instance, whenever an inmate needs a strip search, a pat-down, or a photograph of a tattoo in a sensitive body area, an officer of the same sex must provide it. (ECF No. 10, PageID.63.) There are two to four "female-only duties" in an average shift, Roman estimated. (ECF No. 15-10, PageID.238.) During her career with the County, Roman has never experienced a situation when no female officer was available to perform one of those duties. (*Id.*)

After the officers bid on their preferred shifts each year, the County and the officers' union assign shifts to the officers pursuant to a collective bargaining agreement. (ECF No. 10, PageID.63.) Seniority is one factor in the allocation of shifts. (*Id.*) But the assignment process changed in recent years, following the appointment of Troy Goodnough as jail operation manager in 2013. (ECF No. 10, PageID.62.) While there was no minimum number of female officers in the main jail in 2014, the County began requiring at least two women to work on each six-person team in 2015. (ECF No. 15-6, PageID.219,221.) Then, in 2016 and 2017, that number increased to three women per team. (ECF No. 15-6, PageID.223,225.) There are no such provisions relating to men nor are there staff minimums for the dormitory. (*Id.*) The collective bargaining agreement also changed in 2016, broadly giving the County "the right to ensure adequate staffing of each gender" instead of requiring "at least two (2) employees of each gender" on each team. (ECF No. 15-3, PageID.211; ECF No. 15-4, PageID.216.)

Roman and Moore explain that work in the main jail is harder and less desirable than in the dormitory. (ECF No. 15, PageID.153.) Officers in the main jail must deal with suicide watches,

frequent fights, bookings, and inmates who are detoxing. (ECF No. 15, PageID.154.) And when assigned to the female side of the main jail, a single officer is responsible for various tasks ranging from medical checks to linen exchange. (ECF No. 15-10, PageID.236.) By comparison, inmates in the dormitory (many of whom are considered low-security) reside in a single confined area. (ECF No. 15, PageID.148.) Roman described shifts in the dormitory environment as "a lot less stressful," whereas Moore characterized work there as "more laid-back." (ECF No. 15-9, PageID.228; ECF No. 15-10, PageID.234.)

At the time of Plaintiffs' complaint, they were among roughly 10 to 15 women who worked as corrections officers for the County. (ECF No. 1, PageID.3.) Even though Roman and Moore have substantial seniority and prefer to work in the dormitory, they have been assigned to that facility less frequently than in past years. (ECF No. 1, PageID.5.) This is because more women are needed to staff the main jail and the number of female officers is limited. (ECF No. 1, PageID.4.)

In late 2015, Roman had a meeting about staffing policies with Goodnough and the union president. (ECF No. 15-10, PageID.232–233.) Goodnough seemed angry and told her that "if [you] don't like the job [you] can leave," she stated. (*Id.*) "If it were up to him," she recalled Goodnough saying, "he wouldn't have any females working at the dormitory." (*Id.*) Goodnough also threatened to change Roman's shifts whenever he wanted. (*Id.*)

Plaintiffs acknowledge that their job description includes working at both locations and that there is no difference in salary or promotional opportunities between the jail and the dormitory shifts. (ECF No. 10-5, PageID.101; ECF No. 10-7, PageID.125.) Still, they argue that the three-women-per-shift policy is discriminatory because they are subject to worse working conditions than men who have less seniority. Roman and Moore agree with the County that there needs to be at least one female officer in the main jail for sensitive tasks relating to female inmates—but they

3

question the rationale for placing so many women at the main jail and so few at the dormitory. (ECF No. 15, PageID.150.)

The County argues two reasons why summary judgment should be granted. As discussed below, though, there are remaining fact issues that must be decided by a jury.

## II.

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A fact is material only if its resolution will affect the outcome of the lawsuit." *Id.* at 451–52 (citing *Anderson*, 477 U.S. at 248). In evaluating a motion for summary judgment, this Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.

### A.

Title VII of the Civil Rights Act of 1964 bars employers from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). When a plaintiff lacks direct evidence of discrimination, she may present indirect evidence under the three-part framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). *See Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606 (6th Cir. 2019).

First, the plaintiff has the burden, which "is not an onerous one," to present sufficient evidence to establish a prima facie case of discrimination. *See id.* (quoting *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015)). To do so, she must demonstrate that she "1) is a member of a protected class; 2) was qualified for [her] job; 3) suffered an adverse employment decision; and 4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *Id.* at 606–07 (internal quotation marks omitted) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008)). If the plaintiff satisfies those criteria, the burden then shifts to the employer, who must provide a legitimate, nondiscriminatory reason for its employment action. *See id.* at 607. Finally, if the employer meets its burden, the plaintiff must show that the given explanation is a pretext for discrimination. *See id.*

The County disputes only that Plaintiffs have suffered an adverse employment decision. However, viewing the evidence in the light most favorable to Roman and Moore, the Court finds that there is a genuine factual dispute regarding this issue.

To see why, consider the relevant case law.

"An adverse employment action is an action by the employer that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 481 (6th Cir. 2012) (quoting *White*, 533 F.3d at 402). An adverse employment action must be more than a "bruised ego," a "mere inconvenience," or an "alteration of job responsibilities." *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010) (quoting *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 797 (6th Cir. 2004) (en banc)). The court must consider "whether an action resulted in a plaintiff receiving a less distinguished title, a material loss of benefits, significantly diminished material

5

responsibilities, or other indices that might be unique to a particular situation, along with other markers of prestige and desirability." *Redlin*, 921 F.3d at 607–08 (internal quotation marks omitted) (quoting *Spees*, 617 F.3d at 391). A position transfer can constitute an adverse employment action, whether or not the transfer results in a pay deduction. *See Spees*, 617 F.3d at 391.

Many out-of-circuit cases have analyzed adverse employment actions in the context of corrections facilities. In *Piercy v. Maketa*, 480 F.3d 1192 (10th Cir. 2007), a female corrections officer challenged a policy that allowed only male officers to transfer to a smaller, maximum-security facility. The female employee believed that work in this facility was safer and less difficult than work in the general jail. *See Piercy*, 480 F.3d at 1195. Job duties in the two buildings were not substantially similar because the plaintiff had provided evidence that work at the other facility was "less arduous and stressful." *See id.* at 1205. So the court held that the transfer denial based on sex could constitute an adverse employment action and that summary judgment was not warranted. *See id.*

Another court considered a policy that required two female deputies to be on duty in the women's part of a jail while having no such mandate for the general detention center. *See Eddy v. City & Cty. of Denver*, 2018 WL 1470196, at *1–2 (D. Colo. Mar. 26, 2018). The female deputies alleged that the work in the women's section was more difficult and stressful because the workload was larger and more varied and there was no segregation based on inmate dangerousness. *See id.* The court found that the differences between the two assignments were "substantial" rather than "mere inconveniences." *See id.* at *13. A jury could reasonably decide that having to work more in the building with greater duties and higher stress was sufficient to show an adverse employment action, the court concluded. *See id.*

Other cases about officer transfers and transfer denials have held that changes in safety could indicate adverse employment decisions. *See, e.g.*, *Patrolmen's Benevolent Ass'n v. City of New York*, 310 F.3d 43, 51–52 (2d Cir. 2002) (holding that a police officer who "feared for his safety" after being transferred to a new precinct could have suffered an adverse employment action); *Guzman v. City of New York*, 2010 WL 4174622, at *19 (E.D.N.Y. Sept. 30, 2010) ("A jury could find that reducing inmate contact, sometimes to one or two inmates at a time, results in materially safer working conditions.").

These cases provide support for Plaintiffs' argument that they suffered an adverse employment action. The officers who work in Monroe County's main jail must deal with frequent fights and inmates with a mix of security levels. A reasonable jury could find that this position carries higher safety concerns than the "more laid-back" dormitory assignment. *See Patrolmen's Benevolent Ass'n*, 310 F.3d at 51–52; *Guzman*, 2010 WL 4174622, at *19. Additionally, responsibilities in the main jail include suicide watches, dealing with detoxing inmates, and a wide range of other tasks. So a reasonable jury also could find that assignment to be more arduous and more stressful than the dormitory position. *See Piercy*, 480 F.3d at 1205; *Eddy*, 2018 WL 1470196, at *13.

Roman and Moore have produced evidence that under the new policy, men are given priority over women to work at the dormitory—even if the female officer has more seniority. And Roman and Moore assert that the dormitory is a preferred work environment. A jury could find that the change in available shifts amounts to more than a "bruised ego" or a "mere inconvenience." *See Spees*, 617 F.3d at 391. The County stresses that Roman and Moore have faced no decrease in pay or promotional opportunities. But those facts alone do not mean that Plaintiffs have not suffered an adverse employment action. *See id.* Rather, the assignments necessitated by the three-

7

women-per-shift policy could be considered a "significant change in employment status." *See Regan*, 679 F.3d at 481.

So a reasonable jury could find that Plaintiffs suffered an adverse employment action. This means that Roman and Moore can establish the elements of a prima facie case of sex discrimination.

**B.**

Once Plaintiffs make out a prima facie case, the burden of production shifts to the County. As discussed above, step two of *McDonnell Douglas* requires an employer to produce evidence of a legitimate, nondiscriminatory reason for its employment action. But the County opts not to do so. Instead, the County argues that its policy *is* based on sex but that it is entitled to Title VII's bona fide occupational qualification (BFOQ) defense.

Title VII states that sex-based employment policies are not unlawful when "sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e-2(e). The Supreme Court has stressed that the BFOQ defense is "an extremely narrow exception to the general prohibition of discrimination on the basis of sex." *Dothard v. Rawlinson*, 433 U.S. 321, 334 (1977).

The Sixth Circuit described the three requirements of a BFOQ defense in *Everson v. Michigan Department of Corrections*, 391 F.3d 737 (6th Cir. 2004). First, "an employer must have a basis in fact for its belief that gender discrimination is reasonably necessary—not merely reasonable or convenient—to the normal operation of its business." *Everson*, 391 F.3d at 748 (internal citation and quotation marks omitted) (quoting *Dothard*, 433 U.S. at 335; *Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385, 388 (5th Cir. 1971)). Second, the "job qualification must relate to the essence, or to the central mission of the employer's business." *Id.* at 749 (quoting *Int'l*

*Union, UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 203 (1991)). Finally, the employer has the burden to show "no reasonable alternatives" to the sex-based discrimination exist. *Id.*

In *Everson*, the court considered a policy of the Michigan Department of Corrections (MDOC) that required women to work in certain positions in the housing units of female prisons. *See id.* at 761. The court concluded that the BFOQ defense applied because of the deference given to prison officials and the acknowledgement that "security, safety, privacy, and rehabilitation can justify gender-based assignments in female correctional facilities." *Id.* at 750. The court agreed with MDOC that the policy—which was instituted in the wake of high-profile sexual-misconduct lawsuits—would "significantly enhance security" in the female facilities. *See id.* at 753. Among other reasons, having male guards in the female housing units would have made the officers "gun-shy" about discipline and required extra barriers between inmates and guards. *See id.* at 753–54. The *Everson* court emphasized "the limited nature" of its opinion, though, and declined to extend its holding "beyond the approximately 250 positions we have discussed." *Id.* at 761.

According to the County, *Everson* establishes that a BFOQ exists here. Not so. The facts of this case differ greatly from *Everson*. Roman and Moore do not dispute that one or two female guards need to be on duty at the main jail for certain sensitive tasks like strip searches of women. Nor do they contest that corrections officials receive some deference for decisions related to security, safety, and privacy of the facilities. Here, what is at issue is the newly instituted policy requiring *three* female guards on shifts at the main jail at all times, which makes it less likely for women to receive the preferred dormitory assignments.

By comparison, Monroe County's practice is similar to one struck down by a court in *Henry v. Milwaukee County*, 539 F.3d 573, 585 (7th Cir. 2008). In that case, a juvenile detention center's new policy required each unit to be staffed at night by an officer of the same sex as that unit's

detainees—resulting in six positions available for men and just one for women. *See id.* at 577 & n.4. This meant that female officers were more likely to work during the unisex shifts in the daytime, which were perceived to be more difficult and less likely to result in overtime pay. *See id.* at 577. The county's sex-based policy was not entitled to a BFOQ defense, the court held, because it was not based on a "reasoned decision-making process." *See id.* at 582–83. For instance, the county did not show that a reduction in opposite-sex staff on the night positions was reasonably necessary for security or privacy. *See id.* at 581.

Ultimately, a jury could conclude that Monroe County does not have a basis in fact for believing that shifts of at least three women in the main jail are reasonably necessary. According to Roman, there are only two to four female-only duties in an average shift and she has never been on a shift that lacked women to handle these duties. The policy results in a main-jail staff that is at least half women even though the jail's population is only one-quarter women. As a result, male officers are given preferable assignments in the dormitory even if they have less seniority.

Thus, while officials in *Everson* had instituted new regulations due to allegations of sexual misconduct and other problems, the County here has not explained its rationale for mandating that three women work on every team in a main jail whose population is overwhelmingly male. Although data indicates that the number of female inmates rose slightly in recent years (ECF No. 10-3, PageID.77), the County's brief does not contend that this was relevant to its decision to change the staffing policy. In fact, the number of male inmates also increased around the same time. (ECF No. 15, PageID.149; ECF No. 15-2.) And the new collective bargaining agreement only requires "adequate staffing of each gender" rather than a set number of women at each facility.

The County has not offered a reasoned explanation why it would be inadequate to have one or two female guards per shift in the main jail, as before, with the remainder available to work in

the dormitory. Quite the opposite. In Roman's meeting with Goodnough, the jail operation manager allegedly said he would never let a woman work in the dormitory if "it were up to him." Goodnough's alleged threat to change Roman's shifts as he pleased—a statement that the County does not dispute—also could undermine the argument that the shifts are assigned as part of a rational decision-making process. Ultimately, a jury could find that the County has not met its burden of showing no reasonable alternatives to the three-women-per-shift policy.

The Court acknowledges that prison officials are entitled to some deference in order to craft policies that are reasonably necessary for security and privacy. And *Everson* counsels that, at least in limited circumstances, there can be justification for sex-based assignments in female correctional facilities. But, as discussed above, the facts and current record here are readily distinguishable from those in *Everson*.

A BFOQ defense is "an extremely narrow exception." *Dothard*, 433 U.S. at 334. Because a reasonable jury could find that no BFOQ defense applies (and the County did not offer a legitimate, nondiscriminatory reason for its new policy), summary judgment is inappropriate.

**IV.**

Roman and Moore have raised a genuine issue of material fact as to whether Monroe County's staffing policy violates Title VII. Accordingly, the County's motion for summary judgment is DENIED.

SO ORDERED.

Dated: December 10, 2019

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE
